IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


**JUAN RODRIGUEZ,**

     **Plaintiff,**

**v.**                                       **No. 13-CV-1157 MCA/SCY**

**RELIANCE STANDARD LIFE
INSURANCE COMPANY,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the *Motion for Judgment on the Administrative Record and Alternatively, Motion for Summary Judgment* filed by Plaintiff. [Doc. 23] The Court, having considered the submissions, the pertinent law, and being otherwise fully informed in the premises, hereby **GRANTS** the Motion.

## BACKGROUND

Plaintiff speaks only Spanish, which is exhibited throughout the record from Defendant's claims processing notes, [AR 186, 201] to some of Plaintiff's medical records [AR 519], to the Independent Medical Review conducted by Dr. Radecki. [AR 645]

Plaintiff worked as a concrete laborer for 28 years. [Doc. 23-1, p. 1] Plaintiff developed severe osteoarthritis in both knees. [AR 362-63] He underwent two total knee replacements, the last of which was completed when Plaintiff was 60 years old. [AR 422, 455] While waiting for his knee replacement surgeries, Plaintiff requested an

accommodation and his employer accordingly reassigned him to the position of "Tool

Room & Receiving Clerk, Runner/Courier."  [AR 200, 433]  The job description for the

Tool Room Clerk, Runner/Courier was:

> Job Duties:
> Maintain inventory count on tools and supplies needed for production department.
> Maintain inventory count on safety equipment supplies for production department.
> Place orders as needed for the production department, as inventory levels indicate.
> Receive shipment orders. Verify quantities and product match up to the Purchase Order, any discrepancies, need to be noted on the bill of lading and the Purchase Order.
>
> As a runner/courier your duties will include operating a company vehicle to pick up orders for the production and repair and maintenance department. A yearly motor vehicle background check will need to be conducted as part of your job duty.  You must adhere to the company policy in regards to operating a company vehicle. You will also be a courier for the office staff for picking up the mail daily, delivering documents/contracts and any other requirement that office administration may request.

[AR 433]

Around three months after his second knee replacement surgery, Plaintiff reported

to his doctor that he was doing well and had no complaints.  [AR 555]  Plaintiff's doctor

returned him to light duty work.  [AR 555]  Plaintiff went to work on July 25, 2011, but

he was only able to work for a couple of hours before "the pain in the left knee

significantly increased to the point where he was unable to work," according to his next

medical record.   [AR 560]   Given Plaintiff's complaints of pain, his health care

practitioners restricted him from working and continued to follow Plaintiff for the next 4

months.  [AR 561, 565, 570] On December 8, 2011, Plaintiff returned to the doctor, still

having pain in his left knee.  The doctor told Plaintiff that he believed the pain could be

corrected with another surgery.  Plaintiff responded that his pain was manageable and he

was willing to put up with it.  Though Plaintiff requested "disability status," the doctor

returned Plaintiff to work on light duty.  [AR 574]  Plaintiff does not now dispute that he

can work on a light duty status.  [Doc. 25, p. 3]

> Plaintiff had a long term disability policy through Defendant.  The policy stated:
>
> "Totally Disabled" and "Total Disability" mean, that as a result of an injury
> or Sickness:
> (1) during the Elimination Period and for the first 24 months for which a
>     Monthly Benefit is payable, an Insured cannot perform the material
>     duties of his/her regular occupation;
> . . .
> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot
>     perform the material duties of any occupation.  Any occupation is one
>     that the Insured's education, training or experience will reasonably
>     allow.  We consider the Insured Totally Disabled if due to an Injury or
>     Sickness he or she is capable of only performing the material duties on a
>     part-time basis or part of the material duties on a Full-time basis.

[AR 12]  Plaintiff received long term disability benefits for the first 24 months and it is

undisputed that Plaintiff could not return to his prior occupation.  [AR 226; Doc. 24, p. 5]

> Defendant periodically reviewed Plaintiff's claim.  [AR 183-185]  Through

February of 2012, Defendant indicated that it was unlikely that Plaintiff would be able to

return to work.  For example, in a review by a "VR consultant" on February 28, 2012,

Defendant's consultant stated:

> Mr. Rodriguez has transferable skills.  "Transferability implies that skills
> which are used in one job can be interchanged or substituted into another
> job."  However, in light of his physical restrictions and limitations and in
> consideration of his vocational experiences and limited educational
> background (Mr. Rodriguez completed only the 6th grade), no alternate
> occupations were identified at the sedentary level[.]

3

[AR 588]   Based on the fax date stamp, Defendant had received the record from Plaintiff's treating physician returning Plaintiff to light duty work prior to this review. [AR 552, 575]

From the date it granted initial disability benefits, Defendant encouraged Plaintiff to seek Social Security Disability benefits and had its contractor, Allsup, Inc., contact Plaintiff to assist Plaintiff in obtaining Social Security Disability benefits.  [AR 266-67, 285-87] On February 4, 2012, with the help of Allsup, Plaintiff was approved for Social Security Disability benefits.  [AR 285; AR 616]  Allsup charged Defendant $4500 for its services.  [AR 603]  Per its policy, Defendant concluded that it had overpaid Plaintiff by $19,670.85, and, on April 18, 2012, Defendant recovered this amount from the $19,938.00 lump sum payment Plaintiff received in retroactive benefits from the Social Security Administration.  [AR 306-08, 604]

On August 17, 2012, a nurse reviewed Plaintiff's file.  She noted that Plaintiff had completed an "ADL" (activities of daily living) form since the last review, and concluded that "[s]edentary restrictions and limitations remain supported."  [AR 185]  However, on August 27, 2012, the same nurse made an addendum to the review, stating:  "Based on the claimant's completed ADL form, it is determined that an IME is needed to determine present function."  [AR 185]   The same day, Defendant requested an Independent Medical Review (IME) for Plaintiff to determine whether he would be eligible for continued long term disability benefits.  [AR 627]  Richard Radecki, M.D., performed the IME, and, consistent with Plaintiff's medical record dated December 8, 2011, *supra*,

reported that Plaintiff could do light duty work.   [AR 651]   Given this conclusion, Defendant had a Vocational Rehabilitation Consultant perform a Residual Employability Analysis.   [AR 657]   This Vocational Consultant concluded that, when considering Plaintiff's "limited education (6th grade) and vocational experiences," Plaintiff could perform three jobs:  Deliverer, Outside; Parking-Lot Attendant; and Car-Wash Attendant, Automatic.   [AR 657]   Based on this analysis, Defendant denied Plaintiff's claim for continued long-term benefits.  [AR 325-28]  There is no discussion of Plaintiff's primary language or level of proficiency in English in either the vocational report or the initial denial.  [AR 325-28, 657]

Plaintiff appealed the denial of his benefits.  Plaintiff's physician wrote a letter on Plaintiff's behalf, stating that Plaintiff should continue to receive long term disability benefits because Plaintiff was also suffering degenerative shoulder changes and could not return to work "due to the risk for further injury and more damage to his shoulders" and he would require "a significant amount of job training skills (primary language is [S]panish) and then placement."  [AR 668]

Plaintiff's attorney had him undergo a separate Vocational Analysis.  [AR 691-92] This Vocational Consultant stated that Plaintiff is "mono-lingual in Spanish."  [AR 691] She stated that:

> Mr. Rodriguez suffers from osteoarthritis having undergone bilateral knee replacements. . . .  An unsuccessful work attempt was made on July 25, 2011 at which time Mr. Rodriguez worked half a day.  The letter of Dr. Montoya dated 12/26/12 states that due to continuing shoulder problems and the risk of further injury, Mr. Rodriguez would not be able to return to any gainful employment, including light duty work.

5

> As per the policy verbiage, Mr. Rodriguez is "unable to perform the material duties of any occupation" at this time.  Vocational alternatives put forth by Reliance were Outside Deliverer, Parking Lot Attendant, and Car Wash Attendant.  All of the said positions would involve continued standing for long periods of time, speaking English for the parking lot attendant, and the use of his shoulder, which has been precluded by Dr. Montoya.
>
> I do not find Mr. Rodriguez employable in any occupation, sedentary or light.  He has no transferable skills, cannot speak English, has no formal training, and has worked in heavy, unskilled labor all of his life.

[AR 692][1]

In response to Plaintiff's appeal, Defendant sent Plaintiff's file for a "Peer Review" by Eddie Sassoon, M.D.  [AR 719-725]  Dr. Sassoon focused only on Plaintiff's physical ability, and he recognized that Plaintiff had limitations, including but not limited to:  standing or walking limited to four hours in each eight hour work day; no crawling, kneeling or squatting; but no limitation on reaching.  [AR 723]  Dr. Sassoon further concluded that it did "not appear reasonable, taking into consideration the claimant's complaints and treatment that he is unable to work in any/all capacities" and it was "not reasonable to conclude that the claimant lacked any/all work capacity, including full time sedentary/light work capacity."  [AR 724]  Defendant then had another Residual Employability Analysis conducted, in which the Vocational Rehabilitation Consultant concluded:

---

[1] In addition, Plaintiff's attorney submitted an "FCA Report" by Rio Rancho Physical Therapy which indicated that Plaintiff's "tested functional ability does not match his job description of concrete laborer."  [AR 697]  However, it is undisputed that Plaintiff could not return to work as a concrete laborer.  [Doc. 24, p. 5]

> In consideration of his education and employment history, and the restrictions and limitations presented by Dr. Sassoon, the previously identified alternative occupations, Parking Lot Attendant and Car-Wash Attendant, Automatic would no longer be viable.  The one remaining alternative, Deliverer, Outside is viable and within the restrictions and limitations provided.

[AR 726]  Attached to the Residual Employability Analysis is a description of the various requirements of the "Deliverer, Outside" position, with a DOT Code (Dictionary of Occupational Titles Code)[2] of 230.663-010.   [AR 731, 664]   The attachment lists language requirements of 4th through 6th grade, occasional talking and hearing, and general learning ability and verbal aptitudes of 4 (11-33 Percentile).   [AR 731] Significantly, the Residual Employability Analysis does not assess Plaintiff's ability to speak English.

Defendant then again denied Plaintiff's claim for disability.  Based on the Peer Review and final Residual Employability Analysis, Defendant stated:

> As full time light work capacity with specific limitations and restrictions were identified by the medical documentation in your client's file, additional clarification was requested from a vocational perspective.  The file was reviewed by a Vocational Rehabilitation Specialist who indicated that the previously identified occupation of Deliverer would be viable for your client taking into consideration his prior education, training and experience.
>
> . . . .  [W]e are unable to find support that [Plaintiff's] complaints and difficulties equate to a lack of any and all work capacity.  Based on all the documentation we have received and reviewed, we find that your client has the capacity to perform at the light level.  As an alternate light occupation has been identified that your client could perform, he no longer meets the definition of disability and the claim remains closed with no further benefits payable.

---

[2] *Dictionary of Occupational Titles* 205 (United States. Dept. of Labor, ed. 4th ed. 1991).

[AR 338]  Despite Plaintiff providing documentation that he only spoke Spanish, there is no discussion of whether Plaintiff can speak English or whether he met the language requirements of the position of "Deliverer, Outside."  [AR 333]

Plaintiff appeals to this Court and filed a *Motion for Judgment on the Administrative Record and Alternatively, Motion for Summary Judgment* [Doc. 23], in which he raises numerous grounds for reversal, discussed below.  Defendant filed *Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment* [Doc. 24] and therein also asks for judgment in its favor.  [Doc. 24, p. 25]  The Court considers the parties' arguments below.

## ANALYSIS

### *Standard*

"In an ERISA case . . . where both parties move for summary judgment and stipulate that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."  *Cardoza v. United Omaha Life Ins. Co.*, 708 F.3d 1196, 1201 (10th Cir. 2013) (internal quotation marks and citation omitted).  The administrative record is composed of "the materials compiled by the administrator in the course of making his decision."  *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (internal quotation marks and citation omitted).

"If the administrator or fiduciary has discretionary authority, then, absent procedural irregularities, the denial of benefits is reviewed under an arbitrary and

capricious standard." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1146 (10th Cir. 2009) (internal quotation marks and citation omitted).   "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Id.* at 1155 (internal quotation marks and citation omitted).   To survive review, the administrator's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Id.* (internal quotation marks and citation omitted).

Because a plan administrator is a fiduciary of the plan beneficiaries, where, as here, the claims administrator is also the payer of benefits, there is a conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 112 (2008) (holding that "this dual role creates a conflict of interest").   There are no "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. . . . [C]onflicts are but one factor among many that a reviewing judge must take into account."[3] *Id.* at 116.  The Court "must weigh the conflict as a factor in determining whether there is an abuse of discretion, according it more or less weight depending on its seriousness." *Cardoza*, 708 F.3d at 1202 (internal quotation marks and citations omitted).   "The seriousness of a conflict of interest is proportionate to the likelihood that

---

[3] Thus, our Tenth Circuit recognized that *Glenn* abrogated the approach of "shift[ing] the burden to the administrator to establish by substantial evidence that the denial of benefits was not arbitrary and capricious." *Holcomb*, 578 F.3d at 1192-93 (internal quotation marks and citation omitted).

the conflict affected the benefits decision."  *Id.*  (internal quotation marks and citation omitted).  *Glenn* "embrace[s] a combination-of-factors method of review that allows judges to tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together."  *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (internal quotation marks and citation omitted).

### Factors the Court will Consider in Reviewing Defendant's Decision

Plaintiff submits that Defendant's inherent conflict as claims administrator and as the payer of plan benefits must be considered in determining whether Defendant's denial of benefits to Plaintiff was arbitrary and capricious.  [Doc. 23-1, pp. 8-9]  Plaintiff is correct under *Glenn.  Glenn*, 554 U.S. at 116-17.  Furthermore, as in *Glenn*, there are other circumstances suggesting that Defendant's role as payer of benefits influenced its decision on benefits.  *Id.* at 118.  In *Glenn*, "the [Sixth Circuit] found questionable the fact that MetLife had encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work."  *Id.*  The Supreme Court found "nothing improper in the way in which the [Sixth Circuit] conducted its review."  *Id.*

The Sixth Circuit's decision in *Glenn* reveals that the facts in *Glenn* parallel those here in several important respects.  *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006), *aff'd sub nom. Metro Life Ins. Co. v. Glenn*, 554 U.S. at 119.  Ms. Glenn worked as a sales manager for a department store.  *Id.* at 662.  She stopped working and was diagnosed

with severe dilated cardiomyopathy, a condition which caused her heart to inadequately pump blood. *Id.* Ms. Glenn filed for disability benefits from MetLife, which were granted for an initial two year period in which she needed to show only that she could not perform the material duties of her regular job. *Id.* After that, she was required to show that she could not perform any gainful work. *Id.* MetLife, who both administered the plan and paid benefits under the plan, "steered" Ms. Glenn to a law firm to assist her in obtaining Social Security Disability benefits, and the firm succeeded in doing so. *Id.* at 663, 665. MetLife demanded reimbursement from Ms. Glenn's award of retroactive benefits. *Id.* at 663. Subsequently, MetLife denied Ms. Glenn's claim for long-term disability beyond the two year benefits period, concluding that the documentation it had did not "support a disability that would prevent Ms. Glenn from performing any occupation." *Id.* at 665. That documentation included letters and forms from Ms. Glenn's treating physician stating that physically Ms. Glenn could perform sedentary work, but:

> At the present time, I do not believe [Ms. Glenn] should be forced to return to any kind of even sedentary work particularly because it is the psychologic[al] stress of work that really exacerbates her cardiovascular condition and symptom[s]. The patient basically should be considered completely disabled from her dilated cardiomyopathy as well as history of ventricular tachycardia.

*Id.* at 664. In another letter he stated:

> [T]here was never a time where I felt that this patient would be able to return to full-time employment. I strongly believe that employment would put significant stress on her overall system, and she may decompensate. . . . She has a cardiac problem that is exacerbated by any kind of stress.

11

*Id.* at 665.  In its decisions, MetLife never explained its reasons for disregarding both this medical evidence and the determination of the Social Security Administration.  *Id.* at 665, 667, 669.  With regard to MetLife's failure to consider the decision of the Social Security Administration, the Court followed the Seventh Circuit's analysis in concluding that "the inconsistency in litigation positions ha[s] to be factored into a review of the plan administrator's determination for arbitrariness."  *Id.* at 667.  While recognizing that technically the doctrine of judicial estoppel does not apply, both the Sixth and Seventh Circuits analogized the situation to those in which judicial estoppel is appropriate.  *Id.* at 667-68.  "'In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory.  This sequence casts additional doubt on the adequacy of their evaluation of [the claimant's] claim, even if it does not provide an independent basis for rejecting that evaluation.'"  *Id.* at 668 (quoting *Ladd v. ITT Corp.*, 148 F.3d 753, 755-56 (7th Cir. 1998).  Thus, the Court considered the change in position in determining whether the plan's denial of benefits was arbitrary.

Next, the Court discussed MetLife's failure to consider the letters from Ms. Glenn's doctor in determining that it acted arbitrarily in denying Ms. Glenn's claim.  The Court pointed out that MetLife relied on Ms. Glenn's treating physician's assessment that she could physically perform sedentary work, but it failed to consider that he determined that she could not return to work because emotional stress would cause her to decompensate.  *Glenn*, 461 F.3d at 669-70.  The Court stated that "the plan administrator need not accord special deference to the opinion of a treating physician.  By the same token, it may not arbitrarily repudiate or refuse to consider the opinions of a treating

physician." *Id.* at 671. Further, the Court stated that the plan's "failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious." *Id.* at 672. Accordingly, considering as a whole the factors that MetLife 1) had an inherent conflict of interest, 2) took differing positions as to Ms. Glenn's disability based on which position suited it best at the time, and 3) failed to consider pertinent medical evidence, the Sixth Circuit held that MetLife's denial of long term disability benefits was arbitrary and capricious. *Id.* at 674.

In circumstances very similar to those here, our Tenth Circuit has concluded that *Glenn*'s analysis was pertinent and stated that the District Court:

> should have factored the inconsistency created by [the plan] instructing [the claimant] to apply for SSD and reaping the benefits of his successful determination, then summarily rejecting the evidentiary value of that determination almost without comment, into its determination of whether [the plan] acted arbitrarily and capriciously in denying benefits.

*Brown v. Hartford Life Ins. Co.*, 301 Fed. Appx. 772, 776 (10th Cir. 2008) (unpublished decision). In *Brown*, as here, the plan stated that it considered the award of Social Security Disability benefits to the claimant, but the plan did not accord the decision of the SSA weight because it stated that the SSA's determination was "not binding on [the plan]." *Id.* Further, the Court looked at the medical evidence and an Employability Analysis Report and concluded that the district court failed to discuss pertinent evidence from the medical evidence and that the Employability Analysis Report did not discuss particular bases for limitations. *Id.* at 776-77. Accordingly, our Tenth Circuit held that the District Court erred in failing to consider this evidence in its analysis. *Id.* at 777.

Here, Defendant encouraged Plaintiff to apply for Social Security Disability benefits, hired a contractor to assist Plaintiff in obtaining those benefits, and recovered for itself nearly all of the retroactive Social Security disability benefits Plaintiff received. [AR 306-08, 590, 604]  Further, though initially Defendant's claims notes indicate that there were no alternate occupations which Plaintiff could perform [AR 588], *after* Plaintiff received benefits Defendant decided to send Plaintiff to an Independent Medical Examination.  Nonetheless, and arguably unlike *Glenn*, Defendant did not "ignore" the decision of the Social Security Administration, as Defendant stated in its final decision:

> As for Mr. Rodriguez's receipt of SSDI benefits, this information is certainly considered in our evaluation of his claim, but the receipt of such benefits does not guarantee that an individual will be awarded LTD benefits from RSL (and vice versa).  A person's entitlement to each of these benefits is based upon a different set of guidelines which sometimes leads to differing conclusions.  Oftentimes, each benefit provider is also considering different medical evidence in the evaluation of a claim.  For example, in Mr. Rodriguez's case, the Social Security Administration ("SSA") was not privy to the results of our independent medical report.  Had they reviewed this report along with the other medical information which was before them, they certainly could have reached a different conclusion.  In any event, the receipt of SSDI benefits does not guarantee the receipt of LTD benefits, and vice versa.

[AR 338]   However, the Court concludes that Defendant's timing of waiting until Plaintiff had received Social Security Disability to send Plaintiff for an IME is questionable.  [AR 185]  Further, Defendant does not identify which "different set of guidelines" led to Defendant's denial of benefits, thus preventing meaningful review of this reason advanced by Defendant.  This leaves only Defendant's conclusion that the "independent medical report" allowed a different conclusion from the Social Security Administration.  Dr. Radecki concluded that Plaintiff could perform work on a light duty

basis, which is not disputed.  However, as recognized throughout the record, including by Dr. Radecki [AR 645], Plaintiff cannot speak English, which is the basis for Plaintiff's next argument, discussed below, that Defendant erred in denying him benefits.

In sum, Defendant initially took the position that Plaintiff was disabled [AR 185], but, after it recouped much of what it had paid Plaintiff in initial long-term disability benefits out of Plaintiff's award of retroactive Social Security Disability benefits, Defendant decided to further investigate and ultimately changed its position.  The Court will consider this change in positions and Defendant's inherent conflict of interest, along with the other evidence (discussed below) in determining whether Defendant's denial of long-term disability benefits to Plaintiff was arbitrary and capricious.

### Was the Determination that Plaintiff can Perform the Job of Deliverer, Outside Arbitrary and Capricious?

Plaintiff submits that Defendant's decision that he could perform the job of "Deliverer, Outside" was arbitrary and capricious because it did not "take into account that the Plaintiff is illiterate in the English language."  [Doc. 23-1, p. 9]  Plaintiff submits that Defendant's vocational consultant's determination [AR 726-31] failed to discuss or take into account the educational requirement of the position and Plaintiff's actual educational ability.   The position of "Deliverer, Outside" was identified from the *Dictionary of Occupational Titles*,[4] which lists various positions and their requirements, including educational, physical, and vocational preparation requirements.  [Doc. 23-1, pp.

---

[4] The record indicates that the Vocational Rehabilitation Specialist relied in part on the Dictionary of Occupational Titles, but does not indicate why the language requirement of the identified position was not considered, or if it was considered, how it was met.  [AR 726-31]

4-6]  The language requirements for the position were level 2,[5] which, according to the

*Dictionary of Occupational Titles*, requires:

> Reading:  Passive vocabulary of 5,000-6,000 words.  Read at rate of 190-
> 215 words per minute.  Read adventure stories and comic books, looking up
> unfamiliar words in dictionary for meaning, spelling, and pronunciation.
> Read instructions for assembling model cars and airplanes.
> Writing:  Write compound and complex sentences, using cursive style,
> proper end punctuation, and employing adjectives and adverbs.
> Speaking:   Speak clearly and distinctly with appropriate pauses and
> emphasis, correct pronunciation, variations in word order, using present,
> perfect and future tenses.

*Id.* at 1011[Doc. 23-1, p. 5]  Plaintiff argues that he does not meet these requirements in

that he has only a 6th grade education, obtained many years ago in Mexico, and speaks

and understands no English.  [Doc. 23-1, pp. 6-8]

    The only evidence in the record is that Plaintiff does not speak English.  [AR 691]

Neither Defendant's initial denial of Plaintiff's claim nor its final denial of Plaintiff's

claim mention or consider the fact that Plaintiff is mono-lingual in Spanish.  [AR 325-27,

336-339]    The  Final  Decision  states  "The  file  was  reviewed  by  a  Vocational

Rehabilitation  Specialist  who  indicated  that  the  previously  identified  occupation  of

Deliverer would be viable for your client taking into consideration his prior education,

training and experience."  [AR 338]  However, both the final denial and Defendant's

Vocational Rehabilitation Consultant fail to mention that Plaintiff is mono-lingual in

Spanish.  [AR 338, 726]  Thus, there is no evidence that Defendant considered the

evidence which Plaintiff submitted showing that Plaintiff cannot speak English.  *See*

---

[5] According to Plaintiff, his previous job required language skills at the lower level of 1,
which requires, among other things, recognizing the meaning of 2,500 words, printing
simple sentences and speaking simple sentences.  [Doc. 23-1, p. 6]

*Glenn*, 461 F.3d at 672 (stating that the "failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious"); *see also Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 633-34 (10th Cir. 2003) (stating that it is impossible to properly review the basis for the plan's adverse decision where it did not address information submitted by the claimant after the initial denial).  Moreover, the contract states that "any occupation is one that the Insured's education, training or experience will reasonably allow."   [AR 12]   Regardless of whether it measured Plaintiff's English skills by the standards set forth in the *Dictionary of Occupational Titles* or the standards attached to the Residual Employability Analysis, Defendant failed to consider pertinent evidence that Plaintiff does not have the language skill, i.e., "education, training and experience" necessary to perform the work it identified.  *See Glenn*, 461 F.3d at 674 (holding that the plan administrator failed "to factor in one of the major considerations" for the claim of disability).

Defendant argues that Plaintiff engaged in door-to-door preaching, which shows that he can "function in an English-speaking environment" and that he was able to perform as a tool room clerk/courier which required him to manage inventory, place orders and receive shipments.  [Doc. 24, p. 15]  Defendant also contends that Plaintiff performed the same duties as the runner/courier as which he would be required to do as a deliverer, outside, including operating a company car to pick up orders and deliver documents.  [Doc. 24, p. 16]  Defendant argues that Plaintiff signed papers written in English including his long term benefits enrollment card and his position description. [Doc. 24, p. 15] Finally, Defendant answers Plaintiff's claim that Defendant was required

to perform a literacy test by citing to the general proposition that the burden is on Plaintiff to prove entitlement to disability benefits.  [Doc. 24, p. 14]

Here, Plaintiff submitted evidence multiple times to Defendant indicating that Plaintiff only spoke Spanish.  The evidence included references that Plaintiff spoke only Spanish by:  Dr. Radecki, the Independent Medical Examiner hired by Defendant; Ms. King, the Vocational Expert hired by Plaintiff; Dr. Montoya, Plaintiff's primary care doctor; and Defendant's claims notes.  Defendant has offered no contrary evidence.  Thus, the Court is not persuaded by Defendant's argument that Plaintiff failed to meet his burden.

Further, the facts on which Defendant relies, without more, do not support Defendant's conclusion that Plaintiff could speak English to the degree required for the "Deliverer, Outside" position.  Defendant's argument that Plaintiff engaged in door-to-door preaching does not allow a conclusion that Plaintiff spoke English without evidence that either his audience only spoke English or he was not with someone capable of translating.  The same lack of evidence undermines Defendant's reliance on Plaintiff's prior work as a tool room clerk/courier because there is no evidence in the record whether Plaintiff indeed had to speak English in this capacity.  Further, that Plaintiff signed forms in English alone does not mean Plaintiff spoke English as someone could have explained the forms to him, particularly given Dr. Radecki notes that Plaintiff's daughter assisted Plaintiff in filling out forms in English.  [AR 645]  Moreover, none of these facts were discussed in either of Defendant's denials of benefits to Plaintiff.  Our Circuit does not "permit ERISA claimants denied the timely and specific explanation to which the law

18

entitles them to be sandbagged by after-the-fact interpretations devised for purposes of litigation." *Spradley v. Owens-Illinois Hourly Emp. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (internal quotation marks and citation omitted).  Instead, "federal courts will consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim." *Id.* (internal quotation marks and citation omitted).  The uncontroverted evidence is that Plaintiff spoke only Spanish, and there is no evidence that Plaintiff had the language skills required to perform the "Deliverer, Outside" position.

In sum, Defendant failed to address pertinent evidence and the evidence does not support Defendant's conclusion that Plaintiff could perform the position of "Deliverer, Outside."  Taking this lack of evidence into consideration, along with the factors of the inherent conflict of interest and Defendant's reversal in position once it was reimbursed out of Plaintiff's award of retroactive Social Security Disability benefits, the Court concludes that Defendant's decision denying Plaintiff benefits was arbitrary, capricious and not supported by the record.  *See Glenn*, 554 U.S. at 118.

While Plaintiff raises other arguments to show error, the Court does not find it necessary to consider them in deciding this case.

### *Award of Benefits Is Appropriate*

"[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175

(10th Cir. 2006) (internal quotation marks and citation omitted). If the plan administrator "fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision," the proper remedy is "to remand the case to the administrator for further findings or explanation." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002)). On the other hand, "[a] remand for further action is unnecessary only if the evidence clearly shows that the administrator's actions were arbitrary and capricious, or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* at 1289 (internal quotation marks and citations omitted). "A remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Ray v. UNUM Life Ins. Co. of Am.*, 224 Fed. Appx. 772, 781 (10th Cir. 2007) (unpublished decision) (internal quotation marks and citations omitted).

In this case there is uncontroverted evidence in the record that Plaintiff is "mono-lingual in Spanish." [AR 691] Defendant erred in analyzing the fully developed evidence, which does not require further findings or explanation. *Compare Caldwell*, 287 F.3d at 1288-89 (holding that where plan erroneously concluded that the claimant could do his prior occupation, remand was necessary for fact finding on whether the claimant could do any occupation). Rather, here "the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits" because Plaintiff lacked the language skills necessary to perform the "Deliverer, Outside" position. *Id.* at 1289 (internal quotation marks and citations omitted); *see also Weber v.*

20

*GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1013-14, 1016 (10th Cir. 2008) (holding that where company relied on a few days' worth of time records which were contrary to several other time records to conclude that the employee was not a full time employee, the denial of benefits was "unreasonable" and the record clearly showed that the employee was entitled to benefits with no need for remand).   Thus, remand is unnecessary and the Court concludes that entry of judgment in Plaintiff's favor is warranted.

### Pre-Judgment Interest

Plaintiff requests prejudgment interest in this case.  [Doc. 23-1, p. 14]  "The award of prejudgment interest is considered proper in ERISA cases. . . . Prejudgment interest is appropriate when its award serves to compensate the injured party and its award is otherwise equitable."  *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002) (internal citations omitted).  The award of prejudgment interest lies in the discretion of the district court.  *Caldwell*, 287 F.3d at 1286.  "The general rule under federal law for awarding prejudgment interest is that 'interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable.'" *F.D.I.C. v. Rocket Oil Co.*, 865 F.2d 1158, 1160 (10th Cir.1989) (quoting *Bd. of Comm'rs of Jackson Cnty. v. United States*, 308 U.S. 343, 352 (1939)).  "Calculation of the rate for prejudgment interest also rests firmly within the sound discretion of the trial court. . . . Courts commonly look to state statutory prejudgment interest provisions as guidelines for a reasonable rate." *Weber*, 541 F.3d at 1016 (internal quotation marks and citation omitted).

Here, the Court concludes that an award of prejudgment interest would compensate Plaintiff and is equitable.  Plaintiff should have been awarded benefits, and prejudgment interest is proper compensation to make him whole.  *See Allison*, 289 F.3d at 1243.  It would be inequitable to deny Plaintiff the cost of the lost opportunity to use the money which Defendant retained during this litigation.  *See Caldwell*, 287 F.3d at 1286-87 (stating that prejudgment interest is available to "compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment" (internal quotation marks and citation omitted)); *Bethony v. Cont'l Cas. Co.*, 05-CV-0050 JP/DJS (Docket No. 102, p. 4), September 14, 2007 ("It is inequitable to deny successful claimants the cost of the lost opportunity to use money which the defendant wrongfully retained during litigation.").  Defendant has not advanced any reason that prejudgment interest would be inequitable, and the Court concludes that the equities in this case weigh in favor of prejudgment interest.

Based on the reasons set forth in *Weber*, 541 F.3d at 1016 (allowing courts to look to state interest rates for guidance in ERISA cases), *Bethony*, 05-CV-0050 (Doc. 102, p. 5) (setting prejudgment interest rate at 8%) and *Suazo-Abeyta v. Qwest Corp*., 02-CV-66 WFD/WDS (Docket No. 83, pp. 8-9), June 6, 2009 (recognizing that ERISA does not allow for punitive damages and thus concluding that the statutory interest rate set forth in NMSA 1978, § 56-8-4 (2004) of 8.75% where there is not tortious conduct, bad faith or intentional or willful acts is appropriate), the Court concludes that prejudgment interest at the rate of 8.75% pursuant to NMSA 1978, § 56-8-4(B) is reasonable and equitable here.

Pursuant to *Caldwell*, prejudgment interest runs from the date that Plaintiff filed his claim for long-term disability benefits. *Caldwell*, 287 F.3d at 1287.

**CONCLUSION**

**WHEREFORE, IT IS THEREFORE HEREBY ORDERED** that Plaintiff's *Motion for Judgment on the Administrative Record and Alternatively, Motion for Summary Judgment* [Doc. 23] is **GRANTED**.

**IT IS FURTHER HEREBY ORDERED** that the parties are to meet and confer and submit a proposed joint Judgment setting forth the itemized, calculated amount due on or before February 17, 2016. If the parties are unable to agree on a form of judgment, each party shall submit its own proposed form of judgment by February 24, 2016.

**SO ORDERED** this 3rd day of February, 2016 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge